**GLAXO GROUP LIMITED and SmithKline Beecham Corp., Plaintiffs,**

**v.**

**APOTEX, INC., Defendant.**

**No. 00 C 5791.**

United States District Court, N.D. Illinois, Eastern Division.

June 26, 2003.

See also 64 Fed.Appx. 751.

Christopher S. Pennisi, Michael F. Hurley, Morgan, Lewis & Bockius, New York City, Dean Scott Rauchwerger, James F. Smith, Joshua Avinoam Aldort, Clausen Miller P.C., Chicago, IL, Stephen B. Judlowe, Dennis J. Mondolino, Janet B. Linn, Jason A. Lief, Morgan, Lewis & Bockius, LLP, New York City, for plaintiffs.

Hugh L. Moore, Scott B. Feder, Keith D. Parr, Paul J. Molino, William Andrew Rakoczy, Hugh Scott Balsam, Lord, Bissell & Brook, Chicago, IL, for defendant.

***AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW***

GETTLEMAN, District Judge.

This court has conducted a bench trial on plaintiff GlaxoSmithKline Beecham Corp.'s claims against defendant Apotex, Inc. for a declaration of infringement of patent nos. 4562181 and 4,820,833, and on Apotex's counterclaims of invalidity. In accordance with Fed.R.Civ.P. 52(a), the court enters the following findings of fact and conclusions of law.[1]

1. This order contains both findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent that any Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the ex-

### *PARTIES' STIPULATION OF UNCONTESTED FACTS* [2]

1. This is an action for patent infringement. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), 2201 and 2202. The Court has personal jurisdiction over the parties. Venue in this judicial district is proper under 28 U.S.C. § 1391.

2. Plaintiff Glaxo Group Ltd. is a British corporation having a principal place of business in Brentford, United Kingdom. Plaintiff SmithKline Beecham Corp. is a Pennsylvania corporation having a place of business in Research Triangle Park, North Carolina. (Plaintiffs Glaxo Group Ltd. and SmithKline Beecham Corp. are collectively referred to as "GlaxoSmithKline"). **GlaxoSmithKline is an innovator pharmaceutical company engaged in the research, development, clinical testing and regulatory approval of new drug substances and drug formulations for use in medicines.**

3. Defendant Apotex Inc. ("Apotex") is a Canadian corporation having its principal place of business in Weston, Ontario. **Apotex sells generic drug products which emulate pharmaceuticals developed and marketed by innovator companies. Apotex markets and sells generic drug products throughout the United States.**

4. GlaxoSmithKline is the owner by assignment of U.S. Patent No. 4,562,181 ("the '181 patent"), entitled "Amorphous Form of Cefuroxime Ester", which issued on December 31, 1985 and claims highly pure, substantially amorphous cefuroxime axetil. The '181 patent expires on July 29, 2003.

5. GlaxoSmithKline is the owner by assignment of U.S. Patent No. 4,820,833, ("the '833 patent"), entitled "Preparation of a Highly Pure, Substantially Amorphous Form of Cefuroxime Axetil", which issued on April 11, 1989, and is directed to preparing highly pure substantially amorphous cefuroxime axetil by spray drying. The '833 patent also expires on July 29, 2003.

6. GlaxoSmithKline filed this suit for infringement of the '181 patent under 35 U.S.C. § 271(e) *et seq.* and the Declaratory Judgment Act on September 20, 2000. On June 25, 2001, GlaxoSmithKline filed an amended complaint adding a claim for declaratory judgment of infringement of the '833 patent.

7. On March 7, 2001 and July 20, 2001, Apotex filed its Answer and Counterclaims and Amended Answer and Counterclaims. Apotex denied infringement and asserted counterclaims for noninfringement and invalidity of both the '181 and '833 patents.

8. On June 5, 2002, the Court held a hearing on GlaxoSmithKline's motion for preliminary injunction and, on June 10, 2002, issued an order finding in GlaxoSmithKline's favor on all of the mandatory preliminary injunction factors and granting a preliminary injunction. Apotex's appeal of the preliminary injunction order has been rejected by the U.S. Court of Appeals for the Federal Circuit in an unpublished order dated April 22, 2003.

9. GlaxoSmithKline is the holder of a New Drug Application ("NDA") approved by the Food and Drug Administration ("FDA") for tablets containing, as the active ingredient or drug substance, highly pure, substantially amorphous cefuroxime

tent that any Conclusions may be deemed findings of fact, they shall also be considered Findings. *See Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

2. Additional findings of the court are indicated in **bold lettering**. To the extent not contained herein, the court adopts the parties' Revised Stipulation of Uncontested Facts filed on February 28, 2003.

axetil for use as a broad spectrum antibiotic. GlaxoSmithKline markets and sells its tablets under the tradename Ceftin®.

10. GlaxoSmithKline filed its Ceftin® NDA on July 30, 1985.

11. GlaxoSmithKline received approval for its Ceftin® NDA in December 1988. GlaxoSmithKline Ceftin® tablets were launched immediately after receiving FDA approval.

12. Antibiotics are substances which either kill or inhibit the growth of bacteria. There are many classes of antibiotics; the most well known are the penicillins.

13. The antibacterial properties of penicillins are conferred by the β-lactam ring in the structure of the molecule that allows it to bind to proteins in the cell wall of the bacterium. This binding by the antibiotic prevents the cell wall from budding effectively, thereby inhibiting bacterial replication.

14. Although penicillins are broad spectrum antibiotics, they are not effective against all bacteria. Also, as a result of wide use, penicillin-resistant strains of bacteria have developed. These resistant bacteria develop during infections when mutant bacteria produce β-lactamases that can open the β-lactam ring of the penicillin molecule—destroying its effectiveness. This β-lactamase penicillin-resistance is then transmitted by the bacteria from one population to another.

15. Closely related structurally to penicillins are the cephalosporins. Like penicillins, the cephalosporins have a β-lactam ring and both classes are generally referred to as β-lactam antibiotics.

16. The cephalosporin molecule differs from that of the penicillin molecule in that the ring adjacent to the β-lactam ring is a six-membered ring as opposed to the five-membered ring of penicillin. This six-membered ring adds rigidity to the β-lactam ring and protects it from bacterial J-lactamase attack.

17. In the 1970s, GlaxoSmithKline's scientists synthesized a new drug substance, cefuroxime, a broad spectrum cephalosporin antibiotic. Cefuroxime was disclosed and claimed in the patent no. 3974153.

18. Cefuroxime (the carboxylic acid) is not readily absorbed into the bloodstream from the small intestine, and cannot be administered orally because it is poorly absorbed into the bloodstream from the gastrointestinal tract and does not provide the systemic effect required for effective treatment. As a result, cefuroxime is only administered by injection.

19. Because orally administered medicines are preferred for ease of use, cost efficiency and patient compliance, GlaxoSmithKline invested in a development effort to synthesize an orally absorbable form of cefuroxime, that is, one which could pass through the wall of the small intestine into the bloodstream on oral administration. The goal was to synthesize a prodrug of cefuroxime, that is, a compound that could cross the intestinal wall to allow the cefuroxime, the portion of the molecule that imparts antibacterial activity, to be cleaved off the prodrug and enter the circulation.

20. GlaxoSmithKline synthesized many cefuroxime derivatives, including different cefuroxime esters. Among these was a class of cefuroxime esters that showed promise as orally absorbable compounds, including cefuroxime axetil in which an axetil group is attached to the cefuroxime molecule.

21. Cefuroxime axetil is absorbed through the intestinal wall, the axetil portion of the molecule is cleaved off by enzymes and cefuroxime is released to provide its antibiotic activity.

22. The discovery of the new class of cephalosporins, the cefuroxime esters, became the subject matter of U.S. Patent No. 4,267,320 ("the '320 patent" or "Gregson patent"), which issued to GlaxoSmithKline on May 12, 1981. The '320 patent, **entitled "Cephalosporin Antibiotics,"** generally discloses many different cefuroxime esters, including the preferred ester, cefuroxime axetil. **Further development was needed to achieve the necessary high bioavailability and stability in orally administrable form.** The '320 patent has now expired. Glaxo's Dr. Gordon Gribble testified that the '320 patent generally discloses at least 15–20 different cefuroxime esters, including the preferred ester, cefuroxime axetil.

23. Apotex filed an Abbreviated New Drug Application ("ANDA") No. 65–069 on April 5, 2000, seeking approval to market a generic cefuroxime axetil drug product containing a co-precipitate cefuroxime axetil, sorbitol and zinc chloride.

24. 35 U.S.C. § 271(e)(2) states "[I]t shall be an act of infringement to submit–

> (A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent".

25. Apotex submitted its ANDA under section 505(j) of the Federal Food, Drug, and Cosmetic Act.

26. Unlike an NDA submitted by an innovator pharmaceutical company, an ANDA submission by a generic company like Apotex does not require any independent efficacy or safety testing. The ANDA applicant must only demonstrate that its generic version is bioequivalent to the innovator medicine and otherwise relies on the data provided by the innovator.

27. The products that Apotex intends to market are 250 mg and 500 mg cefuroxime axetil tablets, which are bioequivalent to GlaxoSmithKline's Ceftin® tablets and impart the same medical benefit as Ceftin® tablets.

28. The antibacterial component of Apotex's co-precipitate is cefuroxime axetil.

29. Apotex's ANDA states that zinc chloride acts as a stabilizer and sorbitol acts as a solubilizer.

30. The Executive Summary of Apotex's ANDA states that the sorbitol and zinc chloride components of the co-precipitate are excipients.

31. Apotex's ANDA describes the manufacturing process for its tablets. Apotex's manufacturing process starts with pure crystalline cefuroxime axetil USP containing no more than 1.5% of related compounds. The crystalline cefuroxime axetil is added, together with 9% sorbitol and 1% zinc chloride, to a solution of acetone and water. These materials are mixed at high speed for a period of time until a clear solution is obtained. The resulting solution is spray dried under nitrogen producing an amorphous co-precipitate in the form of amorphous particles. This co-precipitate consists of 90% cefuroxime axetil, 9% sorbitol and 1% zinc chloride by weight.

32. The solvents that Apotex dissolves the crystalline cefuroxime axetil, sorbitol and zinc chloride in are acetone and water. Acetone is an organic solvent that is a ketone. Acetone and water evaporate during spray drying.

33. Each particle of amorphous co-precipitate contains hundreds of thousands, if not millions of molecules of cefuroxime axetil, sorbitol and zinc chloride randomly interdispersed in the proportions of 90% cefuroxime axetil, 9% sorbitol and 1% zinc chloride.

34. The cefuroxime axetil molecules, the sorbitol molecules and the zinc chloride

molecules contained in the co-precipitate are randomly dispersed throughout the co-precipitate and have no long range order.

35. Apotex collects, compacts and mills the co-precipitate to form granules. Apotex then mixes the granulated co-precipitate with pharmaceutical excipients—namely crospovidone, sodium bicarbonate and magnesium stearate—and compresses this blend of materials into a tablet core. Apotex sprays a film coating on the tablet core, producing a film coated tablet. The crospovidone and sodium bicarbonate are disintegrates, assisting in the dissolution of the tablet. The magnesium stearate acts as a lubricant.

36. The specification for Apotex's tablets in its ANDA requires that the tablets contain no more than 2% "related impurities" which are further described as "degradation products" in the specification itself.

37. FDA granted final approval of Apotex's ANDA on October 2, 2002.

38. Apotex's Dr. Sherman testified that Apotex conducted several years of research and development to arrive at the co-precipitate that is contained in Apotex's ANDA.

39. Apotex's package insert as approved by FDA identifies Apotex's drug product as follows:

> Cefuroxime Axetil Tablets contains an amorphous co-precipitate of cefuroxime axetil, sorbitol, and zinc chloride. Cefuroxime axetil has the following structural formula [formula omitted]
>
> Cefuroxime Axetil Tablets are film-coated and contain the equivalent of 250 or 500 mg of cefuroxime as cefuroxime axetil. Cefuroxime Axetil Tablets contain the inactive ingredients crospovidone, hydroxyethyl cellulose, magnesium stearate, polyethylene glycol, sodium bicarbonate, sorbitol, titanium dioxide and zinc chloride. USP Release Test Pending.

40. Solid substances can exist in crystalline or amorphous form. In a crystalline solid, the molecules are arranged in a regularly repeating, long range order, often called a lattice. In an amorphous solid, the molecules have no regular, long range order, but are randomly distributed in relation to one another. **Amorphous is often described as the "absence of crystallinity."**

41. The terms "crystalline" and "amorphous" have no application to a single molecule or a few molecules of a substance.

42. The crystalline form or a drug substance is more stable than its amorphous form.

43. A technique for determining whether a substance or preparation is crystalline or amorphous is X-ray powder diffraction.

44. Claim 1 of the '181 patent reads as follows:

> Cefuroxime axetil in amorphous form essentially free from crystalline material, and having a purity of at least 95% aside from residual solvents.

45. Claim 2 of the '181 patent reads as follows:

> The product of claim 1 which contains less than 3% m/m of impurities.

46. Claim 3 of the '181 patent reads as follows:

> The product of claim 1 in the form of a mixture of R and S isomers.

47. Claim 4 of the '181 patent reads as follows:

> The product of claim 3 wherein the mole ratio of R to S isomers is from 3:2 to 2:3.

48. Claim 5 of the '181 patent reads as follows:

> The product of claim 3 wherein the mole ratio of R to S isomers is from 0.9:1 to 1.1:1.

49. Claim 6 of the '181 patent reads as follows:

The product of claim 1 in the form of hollow microspheres.

50. Claim 7 of the '181 patent reads as follows:

A method of combating bacterial infections of the human or animal body which comprises administering to the said body orally or rectally an effective amount of a highly pure substantially amorphous form of cefuroxime axetil as claimed in claim 1.

51. Claim 8 of the '181 patent reads as follows:

An antibacterial pharmaceutical composition containing an antibacterially effective amount of cefuroxime axetil according to claim 1 in admixture with one or more pharmaceutical carriers or excipients.

52. Claim 9 of the '181 patent reads as follows:

The antibacterial pharmaceutical composition of claim 8 wherein the cefuroxime axetil is present in the form of a mixture of R and S isomers.

53. Claim 10 of the '181 patent reads as follows:

The antibacterial pharmaceutical composition of claim 8 wherein the mole ratio of R to S isomers is from 3:2 to 2:3.

54. Claim 11 of the '181 patent reads as follows:

The antibacterial pharmaceutical composition of claim 8 wherein the mole ratio of R to S isomers is from 0.9:1 to 1.1:1.

55. Claim 12 of the '181 patent reads as follows:

The antibacterial pharmaceutical composition of claim 8 wherein the cefuroxime axetil is in the form of hollow microspheres.

56. Claim 13 of the '181 patent reads as follows:

The antibacterial pharmaceutical composition of claim 8 adapted for oral administration.

57. Claim 14 of the '181 patent reads as follows:

The antibacterial pharmaceutical composition of claim 13 in dosage unit form containing from 50 to 500 mg of cefuroxime axetil.

58. Claim 1 of the '833 patent reads as follows:

A process for preparing a highly pure, substantially amorphous form of cefuroxime axetil which comprises preparing a highly pure solution of cefuroxime axetil and spray drying said solution to recover highly pure, substantially amorphous cefuroxime axetil.

59. Claim 2 of the '833 patent reads as follows:

The process of claim 1 wherein the solution contains an organic solvent selected from the group consisting of ketones, alcohols, acetonitrile, tetrahydrofuran, dioxan, esters, chlorinated solvents, homogenous mixtures of at least two of the aforesaid solvents, homogenous mixtures of at least one of the aforesaid solvents and water.

60. Claim 3 of the '833 patent reads as follows:

The process of claim 1 wherein the concentration of cefuroxime axetil in the solution prior to recovery is at least 1% m/m.

61. Claim 4 of the '833 patent reads as follows:

The process of claim 1 wherein the concentration of cefuroxime axetil in the solution prior to recovery is at least 10% m/m.

62. Claim 5 of the '833 patent reads as follows:

The process of claim 1 wherein the spray drying is effected in the presence of an inert gas.

63. The spray drying process described in the '833 patent starts with highly pure cefuroxime axetil in a solution containing an organic solvent. The solution is sprayed into a column through which heated gas is passing. The solvent flash-evaporates leaving the solid form of the cefuroxime axetil in a collection vessel. By this method, the highly pure cefuroxime axetil is recovered in substantially amorphous form. The '181 patent states that it is essential that the starting cefuroxime axetil material be at least as pure as the final product.

64. Today there are only a handful of commercially available solid oral drug products in which the drug substance is in amorphous form. Spectracef®, identified by Apotex's was approved in 2000—18 years after the '181 patent application was filed.

65. During the 15 years that Ceftin® has been marketed, GlaxoSmithKline has realized nearly $4 billion in sales, with yearly sales surpassing $300 million by 1993.

66. GlaxoSmithKline's U.S. sales for Ceftin® were close to $250 million in 2001.

67. GlaxoSmithKline projected only $50 million in sales of Ceftin® for 2002 because of the launch of Ranbaxy's generic cefuroxime axetil product.

68. During the 15 years that Ceftin® has been marketed, it was the most prescribed oral cephalosporin antibiotic in existence.

69. Hampel and Hawley's Encyclopedia of Chemistry (3d ed.1973) defines "purity" as:

A pure preparation of a chemical substance in the absolute sense is one in which all of the molecules in the preparation of the substance are molecules of the substance. No other molecules differing in any way may be present.

70. Longman's Dictionary of Scientific Usage (2d ed.1981) defines "pure" as:

Applied to an element o[r] compound which is made up of, *a* only atoms of the element; *b* only ions or molecules of the compound, *e.g.*, *a* pure gold is a sample of gold which does not contain any other element; *b* a sample of pure water (*i.e.*, chemically pure water) should contain only molecules of H20.

71. Hawley's Condensed Chemical Dictionary (11th ed.1987) defines "purity" and "pure substance" as:

purity, chemical. A substance is said to be pure when its physical and chemical properties coincide with those previously established and recorded in the literature, and when no change in these properties occurs after application of the most selective fractionation techniques. In other words, purity exists when no impurity can be detected by any experimental procedure. There are a number of recognized standards of purity.

purification. Removal of extraneous materials (impurities) from a substance of mixture by one or more separation techniques. A pure substance is one in which no impurity can be detected by any experimental procedure.

72. Impurity is defined by the FDA Guidance for ANDAs: Impurities in Drug Substances as, "[a]ny component of the drug substance that is not the chemical entity defined as the drug substance." The FDA also defines an impurity in a drug product (*i.e.*, drug substance admixed with excipients) as "[a]ny component of the drug product that is not the chemical entity defined as the drug substance [*i.e.* active ingredient] or an excipient in the drug product." (FDA Guidance of the Industry Q3B Impurities in New Drug Products).

73. The *McGraw–Hill Dictionary of Technical and Scientific Terms* (5th ed.1994) defines excipient as "[a]ny inert substance combined with an active drug for preparing an agreeable or convenient dosage form."

74. In 1999, GlaxoSmithKline sued Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy") in the District of New Jersey for infringement of the '181 patent. The district court issued an injunction against Ranbaxy preventing it from marketing generic cefuroxime axetil. In an August 20, 2001, opinion, the Federal Circuit vacated the district court's injunction, determining that the court's claim construction was erroneous and that the claim limitation " 'essentially free from crystalline material' means a maximum crystalline content of less than 10%."

75. Ranbaxy thereafter launched its cefuroxime axetil product, and is currently competing with GlaxoSmithKline's Ceftin®. The underlying suit remains pending in the United States District Court for the District of New Jersey.

76. In 2002, GlaxoSmithKline and its third-party distributor, Professional Detailing, Inc. ("PDI"), mutually terminated its distribution agreement with GlaxoSmithKline concerning Ceftin®.

77. On June 7, 2000, Apotex's Dr. Yuri Goldberg sent a letter to a subcommittee of the United States Pharmacopoeia ("USP"). In this letter to USP's "USP–FDA Monograph Subcommittee" Dr. Goldberg stated:

> Herein we would like to address the concerns expressed by the Committee by providing some additional information.
>
> 1. In our previous correspondence we did not mean to indicate that Apotex Cefuroxime Axetil Tablets contain a mixture of crystalline and amorphous Cefuroxime Axetil.
> 2. Our process of manufacturing Cefuroxime Axetil tablets converts crystalline Cefuroxime Axetil (starting material) to amorphous Cefuroxime Axetil in the form of a co-precipitate with sorbitol. This co-precipitate is further employed in the manufacturing of Apotex Cefuroxime Axetil Tablets. There is no crystalline material in our tablet product.

78. Thereafter, the USP requested that Apotex respond to certain issues concerning dissolution testing. In response, Dr. Goldberg forwarded to the UPS's dissolution and bioavailability subcommittee the complete package of correspondence between Apotex and USP, including the June 7, 2000, letter, on August 1, 2000. Apotex's Drs. Sherman and Cappuccino were listed as copy recipients on Dr. Goldberg's correspondence.

79. The active ingredient of Apotex's Cefuroxime Axetil Tablets 250 mg and 500 mg is the same as that of Glaxo Wellcome's Ceftin® Tablets 250 mg and 500 mg.

80. There is no detectable crystalline material in Apotex's amorphous co-precipitate.

81. Dr. Barry Sherman is the chairman of Apotex. He has a Bachelor and a Masters degree in Engineering and Aeronautics and a Ph.D. in Systems Engineering.

82. Dr. Sherman decides what drugs Apotex will develop and market based on their historic sales levels, **and whether he can design around the various barriers in order to bring the product to market.**

83. Dr. Sherman is not a patent attorney. **Although he had notice of GlaxoSmithKline's patents**, he did not obtain an opinion from patent counsel on noninfringement or invalidity of the '181 and '833 patents before Apotex filed its

ANDA, relying instead on his own review of the patents.

84. Dr. Sherman did not review the file histories of the patents in suit before deciding to file the ANDA.

85. A patent application that Dr. Sherman wrote states, "[h]owever, when the cefuroxime axetil is used in the pure amorphous form or in the form of a co-precipitate, the zinc salt will preferably be added, in the process of making the pure amorphous cefuroxime axetil or the co-precipitate, in order to get a more intimate mixture of the zinc salt with the cefuroxime axetil."

86. The Notice of Allowance for Dr. Sherman's patent states, "[t]he following is an examiner's statement of reasons for allowance: The prior art fails to teach or suggest a solid pharmaceutical composition comprising the active agent cefuroxime axetil and zinc chloride as a stabilizer for the active agent."

### *ADDITIONAL FINDINGS*

87. The crystalline form of a drug substance is typically preferred over the amorphous form because crystalline forms are more stable and thus provide reliable delivery and adequate shelf life.

88. Crystals are also intrinsically purer than amorphous solids because the ordered structure of the crystal tends to exclude impurities which do not conform to the crystalline structure.

89. Before the introduction of Ceftin®, all commercially available β-lactam antibiotics, e.g., penicillins and cephalosporins, were in crystalline form.

90. Crystalline cefuroxime axetil did not dissolve sufficiently in gastrointestinal fluid to make an effective oral medicine. A medicine that does not dissolve adequately cannot pass via the intestinal wall membrane into the bloodstream, and is simply excreted by the individual via his/her intestinal tract without providing a medical benefit.

91. The '181 patent describes the preferred purity level of the claimed drug substance in terms of the level of impurity and identifies typical impurities.

92. Cefuroxime axetil exists as two isomers, the R and S isomers. The R and S isomers of cefuroxime axetil contain the same chemical components, but are mirror images of each other. This is unlike the isomers with different connectivity (*e.g.* the E-isomer and $\Delta^2$–isomers) that are considered impurities of cefuroxime axetil.

93. According to the patent, a mixture of R and S isomers of the cefuroxime axetil is preferred because the mixture has substantially improved solubility compared to a single isomer.

94. Excipients are inert additives or carriers, not the active drug substance, which are deliberately added to the active drug substance to affect its performance or manufacturability in specific ways.

95. In addition to the drug substance in highly pure substantially amorphous form, the '181 patent further describes and claims a pharmaceutical composition that is an admixture of the highly pure, substantially amorphous cefuroxime axetil "with one or more pharmaceutical carriers and/or excipients".

96. The cefuroxime axetil-containing compositions formulated with excipients may contain between 1% and 99% of the active drug substance.

97. The '181 patent also teaches that in a composition for use in tablets, capsules or granules, excipients can be formulated by spray drying the excipients along with the active drug substance.

98. On April 5, 2000, Apotex filed ANDA No. 65–069, seeking immediate approval to market its generic version of

GlaxoSmithKline's Ceftin® medicine. According to its ANDA, Apotex proposes to market 250 mg and 500 mg cefuroxime axetil tablets.

99. Unlike an NDA submitted by an innovator pharmaceutical company, an ANDA submission to the FDA by a generic company like Apotex does not require any independent efficacy or safety testing. The applicant must only demonstrate that the generic version of the medicine is bioequivalent to the innovator medicine. Otherwise the ANDA applicant relies on the data provided by the innovator.

100. Apotex begins the manufacturing process by dissolving pure crystalline cefuroxime axetil (*i.e.,* impurities of no more than 2.0%) in a solution of acetone, water, sorbitol and zinc chloride. Acetone (a ketone) and water are solvents that evaporate during spray drying.

101. Sorbitol is an excipient that is added to foster the dissolution of the cefuroxime axetil in solution. Zinc chloride is an excipient that helps stabilize the cefuroxime axetil and prevents the formation of impurities.

102. Using nitrogen, Apotex then spray dries the solution with an APV Spray Dryer to yield a spray dried mixture of cefuroxime axetil, sorbitol and zinc chloride. Apotex refers to this spray dried mixture as "cefuroxime axetil co-precipitate 90% A.S. Spray Dried". The "90%" refers to the fact that the initial solution contains 90% cefuroxime axetil and 10% excipients—1% zinc chloride and 9% sorbitol.

103. The spray drying process converts the crystalline cefuroxime and axetil to amorphous cefuroxime axetil. The spray dried material is collected, compacted and milled to form granules.

104. Additional excipients crospovidone, sodium bicarbonate and magnesium stearate, are added to the granules, which are further compacted and milled to form the tablet core. Both crospovidone and sodium bicarbonate are disintegrants, assisting in the dissolution of the tablet. The magnesium stearate is a lubricant. A film coating is sprayed on the tablet core to give a film coated tablet. The specifications for the tablets require that they contain less than 2% impurities aside from residual solvents.

105. With full knowledge of the GlaxoSmithKline patents in suit, Dr. Sherman designed a process for formulating cefuroxime axetil tablets. Instead of mixing the drug substance (cefuroxime axetil) with excipients after spray drying, as disclosed in the preferred embodiment of the '181 patent, Apotex mixes the active ingredient cefuroxime axetil with two excipients first, spray dries that mixture, and then combines the mixture with the remaining excipients.

106. Dr. Sherman's process consists of nothing more than the timing of the addition of the excipients during manufacture. Tablets made according to this process are the subject of Apotex's ANDA No. 65–069.

## *CONCLUSIONS OF LAW*

■ 107. Declaratory jurisdiction exists where a company seeking to manufacture a generic version of a patented medicine has, by virtue of its ANDA filing, made meaningful preparation to market an infringing product before the expiration of the patentholder's exclusive rights. *Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1570 (Fed.Cir.1997); *Glaxo, Inc. v. Apotex USA, Inc.,* 1997 WL 282742 at *3, 1997 U.S. Dist. LEXIS 7260 at *9 (N.D.Ill. May 18, 1997), *vacated and remanded on other grounds,* 153 F.3d 1366 (Fed.Cir.1998); 35 U.S.C. § 271(a).

108. This court has declaratory judgment jurisdiction over this case because an actual controversy exists between the par-

ties. 28 U.S.C. §§ 2201 and 2202. *Glaxo Group Ltd. v. Apotex, Inc.*, 130 F.Supp.2d 1006 (2001).

109. The importation and sale in the United States of a product or composition manufactured by an infringing process before the relevant patent expires is an act of infringement. 35 U.S.C. § 271(g); *Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.*, 249 F.3d 1341, 1352 (Fed. Cir.2001); *Ajinomoto Co., Inc. v. Archer-Daniels Midland Co.*, 228 F.3d 1338, 1348 (Fed.Cir.2000).

110. Determining whether an accused device infringes a patent requires a two-step analysis. First, the claims of the patent must be construed to determine the proper scope. Second, a determination must be made as to whether the properly construed claims read on the accused device. *Interactive Gift Express Inc. v. CompuServe, Inc.*, 231 F.3d 859, 864–65 (Fed.Cir.2000). The first step, claim construction, is a question of law for the court. *Vivid Technologies, Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed.Cir.1999). Only those terms in controversy need be construed, and only to the extent necessary to resolve the controversy. *Id.* To construe the claim, the court first examines the intrinsic evidence, consisting of the patent claims, specification and, if in evidence, the prosecution history. *Id.* If the intrinsic evidence alone is insufficient, extrinsic evidence, such as expert testimony, inventor testimony, dictionaries, technical treatises, articles and prior art not cited, may be examined. *Id.* Intrinsic evidence is preferred because it encompasses the materials in the public record. Therefore, if the intrinsic evidence alone resolves any ambiguity, it is improper to rely on extrinsic evidence. *Id.*

The Federal Circuit has set forth the hierarchy of intrinsic evidence. *Vitronics,* 90 F.3d at 1577. First, the court examines the language of the claim. *Id.* "The starting point for any claim construction must be the claims themselves." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed.Cir.1999).

If the claim language is clear on its face, the court's consideration of the rest of the intrinsic evidence is "restricted to determining if a deviation from the clear language of claim is specified. Deviation may be necessary if a patentee [has chosen] to be his own lexicographer and use terms in a manner other than their ordinary meaning." *Interactive Gift,* 231 F.3d at 865 (quoting *Vitronics,* 90 F.3d at 1582). A deviation from the clear language may also be necessary if a patentee has relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference. *Id.*

If the claim language is not clear on its face, then the court considers the rest of the intrinsic evidence to resolve, if possible, the lack of clarity. The court must take care, however, to avoid reading limitations in the specification into the claims. *Id.*

Once the claims have been properly construed, the court must determine whether the accused device infringes the claims, either literally or under the doctrine of equivalents. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir. 1998). Literal infringement is a question of fact and may be decided on summary judgment when no genuine issue of material fact exists, such that no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device. *Id.* Infringement under the doctrine of equivalents is also a question of fact: "whether a reasonable jury could find that the accused device contains elements that are equivalent to each of the properly construed claim limitations." *Id.* at 1354.

111. The parties' dispute the meaning of two terms in the claims of the patents in suit. The court first addresses the term "cefuroxime axetil ... having a purity of at least 95% aside from residual solvents".

*Having a Purity of at Least 95%*

112. The specifications of the patents in suit discuss the surprising realization that the *pure* amorphous form of cefuroxime axetil has reliable stability, "despite the known tendency of amorphous materials to have inferior chemical stability." ('181 patent, col. 2, 15–26). A description of typical impurities follows the discussion of purity of the cefuroxime axetil drug substance. (Col. 2, lines 36–38).

113. The term "purity" has a specific, defined meaning as a chemical term. For example, *Hawley's Condensed Chemical Dictionary* 980 (11th ed.1987) defines purity as:

> Purity, chemical.—A substance is said to be pure when the physical and chemical properties coincide with those previously established and recorded in the literature, and when no change in these properties occur after application of the most selective fractional techniques.
>
> *Also* purification...a pure substance is one in which no impurity can be detected by an experimental procedure. In other words, purity exists when no degrading, unwanted impurities are present.

114. The FDA guidance (FDA Guidance for the Industry Q3B Impurities in New Drug Products) defines an impurity as "[a]ny component of the drug product that is *not* the chemical entity defined as the drug substance [*i.e.* active ingredient] or an excipient in the drug product." The defined meaning of impurities in the pharmaceutical sciences is that they are substances that are not deliberately added to a chemical composition. In other words, impurities are degradation products of the active ingredient, also referred to as related compounds.

115. With respect to cefuroxime axetil, the recognized compendia specifically identified the impurities of the compound. Both the British Pharmacopeia and the European Pharmacopeia list four impurities of cefuroxime axetil: $\Delta^2$–isomer, E-isomer (also referred to as anti-isomer), cefuroxime axetil carboxylic acid and cefuroxime.

116. Purity must be considered in the context of the art—here, the pharmaceutical industry. Pharmaceutical products nearly always consist of an active ingredient and excipients. Carriers or excipients, are the inactive compounds used in formulating the active drug substance into an ingestible form. Excipients are deliberately added to a drug substance to affect its performance or manufacturability in specific ways but their addition does not affect the "purity" of the active ingredient or render the active ingredient in the product "impure." Excipients are expected to be added to the drug substance to formulate a usable medicine, and those of skill in the pharmaceutical art understand that excipients are not impurities.

117. Dictionaries use the same definition of excipient: "Any inert substance combined with an active drug for preparing an agreeable or convenient dosage form". (McGraw–Hill Dictionary of Technical and Scientific Terms, 5th Ed.)

118. The specifications of the patents in suit, described purity separate and apart from the discussion of excipients and provide a detailed description of the use of excipients to formulate pure amorphous cefuroxime axetil.

119. The applicants for the '181 and '833 repeatedly stressed that their invention involved the ability to use a pure amorphous cefuroxime axetil, contrary to

the conventional wisdom that commercial cephalosporin products in pure crystalline form provide the best balance of properties.

120. Nothing in the patent specifications or the file histories demonstrates that the applicants sought to define the claim terms "pure" and "purity" differently than their ordinary technical meaning. *See e.g., Vanguard Products Corp. v. Parker Hannifin Corp.*, 234 F.3d, 1370, 1372 (Fed.Cir.2000).

121. The court construes the term "having a purity of a least 95%" to mean, as it did in its June 10, 2002, Preliminary Injunction Order, to one of skill in the pharmaceutical art that the cefuroxime axetil claimed in the '181 patent must be 95% co-precipitate and have no more than 5% degrading, unwanted impurities. Such impurities do not include excipients, such as sorbitol and zinc chloride; which perform specific functions, added by defendant to the cefuroxime axetil in its product.

*Amorphous*

122. The parties also dispute the import of the term "amorphous" in "cefuroxime axetil in amorphous form essentially free from crystalline material". The meaning of "amorphous" according to one skilled in the art is not in dispute.

123. In a prior action involving the '181 patent, *Glaxo Group Ltd. v. Ranbaxy Pharmaceuticals, Inc.*, 262 F.3d 1333, 1337 (Fed.Cir.2001), the Federal Circuit construed the above quoted limitation as meaning "a maximus of crystalline content of less than 10%."

124. By spray drying its starting solution containing crystalline cefuroxime axetil, Apotex concededly converts the crystalline material to an amorphous state. Apotex admits that the 90% co-precipitate is entirely amorphous.

125. Apotex's spray dried co-precipitate is not a new drug substance. The co-precipitate is a dispersion or mixture of the cefuroxime axetil and two excipients, sorbitol and zinc chloride.

126. Apotex's argues is that the amorphicity of its cefuroxime axetil itself cannot be determined in the context of its "90% co-precipitate," and that for this reason it does not meet the limitation which calls for "[c]efuroxime axetil in amorphous form essentially free from crystalline material". The court rejects this argument for a number of reasons.

First, *Ranbaxy* defined the limitation as meaning less than 10% crystalline. Apotex admitted in its June 7, 2000, letter to USP FDA that there is "no crystalline cefuroxime axetil" in the Apotex product, and that its process "converts crystalline cefuroxime axetil (starting material) to amorphous cefuroxime axetil in the final form of a co-precipitate with sorbitol." (See § 77 above.) The court rejects as not credible Dr. Cappuccino's attempts to disavow the admissions in Apotex's June 7, 2000, letter. Prior to trial no attempts were made to clarify any inaccuracies. Therefore, "since there is no crystalline cefuroxime axetil in the Apotex product, the cefuroxime axetil must be amorphous".

Second, in its ANDA, Apotex stated that the "active ingredient" in its product is the same as that of plaintiff's Ceftin® tablets. Thus, Apotex admits that the drug substance in its product is the same cefuroxime axetil as in plaintiff's tablets, rather than a new or other active drug substance. Apotex also represented to FDA, and FDA found, that the bioavailability of the "active ingredient" in the Apotex product is equivalent to that of plaintiff's Ceftin®. It is undisputed that the level of bioavailability of plaintiff's product can be achieved only by using amorphous cefuroxime axetil. All attempts to reach a satisfactory level of bioavailability using crystalline cefuroxime axetil (in any purity) failed. Thus, by es-

tablishing that Apotex's product has the equivalent bioavailability as plaintiff's product, defendant has established exactly what it told the FDA: that there is no crystalline cefuroxime axetil in its product. In so doing, defendant has also established that plaintiff's product must contain amorphous cefuroxime axetil. Moreover, both Dr. Sherman and Apotex's expert, Dr. Shefter, testified that the co-precipitate is nether a new chemical entity nor a new drug substance, and that the antibacterial affect of Apotex's product comes solely from the cefuroxime axetil in the co-precipitate. To achieve the necessary affect, that cefuroxime axetil must be amorphous. Thus, the court rejects Apotex's argument that the co-precipitate is a "new" material, the contents of which cannot be characterized as either amorphous or crystalline, and concludes that Apotex's product contains amorphous cefuroxime axetil.

*Literal Infringement*

127. The claims define the metes and bounds of the invention, and only they may be infringed. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 882 (Fed.Cir.1988); *Corning Glass Works v. Sumitomo Elec. USA, Inc.*, 868 F.2d 1251 (Fed.Cir.1989).

128. The patentee's burden is to show literal infringement by a preponderance of the evidence. *Braun v. Dynamics Corp.*, 975 F.2d 815 (Fed.Cir.1992).

129. A patent claim is literally infringed if the accused product or process contains each element of the claim. *Tate Access Floors v. Maxcess Tech.*, 222 F.3d 958, 964 (Fed.Cir.2000); *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.1988). If each element is present, literal infringement exists and "that is the end of it." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

130. In determining infringement, the accused product is compared to the patent claims, not the patentee's product. *Zenith Laboratories, Inc. v. Bristol–Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed.Cir.1994); *Glaxo Inc. v. TorPharm Inc.*, 153 F.3d 1366, 1373 (Fed.Cir.1998).

131. Infringement of a single claim is infringement. *Panduit Corp. v. Dennison Mfg. Co. Inc.*, 836 F.2d 1329, 1330 n. 1 (Fed.Cir.1987); *Intervet America v. Kee–Vet Laboratories*, 887 F.2d 1050, 1055 (Fed.Cir.1989), and entitles the patentee to the full panoply of statutory remedies. *Intervet Am. v. Kee–Vet. Lab.*, 887 F.2d 1050, 1055 (Fed.Cir.1989).

132. The analysis with respect to literal infringement of claim 1 is as follows:

For the reasons stated above, the cefuroxime axetil in Apotex's proposed tablets is amorphous with no crystalline content. Thus, Apotex's proposed products will meet the first limitation of claim 1, which reads: "Cefuroxime axetil in amorphous form essentially free from crystalline material."

133. Claim 1 further recites: "having a purity of at least 95% aside from residual solvents". Based on the court's construction that "having a purity of at least 95%" means that the cefuroxime axetil must have no more than 5% degrading, unwanted impurities, and that "impurities" do not include excipients such as sorbitol and zinc chloride, the court concludes that Apotex will literally infringe the second element of claim 1. Apotex's ANDA indicates that its products contain no more than 1% impurities.

134. Apotex has argued throughout this case that its product does not infringe the "purity" limitation because its co-precipitate consists by weight of 90% cefuroxime axetil, 9% sorbitol and 1% zinc chloride. Thus, Apotex argues that its

product cannot have "a purity of at least 95%." There is no question that the cefuroxime axetil used to manufacture the Apotex co-precipitate is highly pure. Apotex starts with highly pure (less than 5% degrading, unwanted impurities) cefuroxime axetil. The addition of the excipients sorbitol and zinc chloride do nothing to alter the purity of the cefuroxime axetil.

Indeed, Dr. Sherman admitted that the addition of zinc chloride does not alter the "purity" of the amorphous cefuroxime axetil in his patent application[3] claiming the use of zinc chloride to stabilize cefuroxime axetil. In that document, Dr. Sherman stated that:

> In order to enable maximum bioavailability, the cefuroxime axetil in the composition will preferably be in pure amorphous form or in the form of a co-precipitate with a water-soluble diluent. The zinc salt may be added to the composition at any point in the process of production of the composition.
>
> However, when the cefuroxime axetil is used in pure amorphous form as in the form of a co-precipitate, the zinc salt will preferably *be added, in the process of making the pure amorphous cefuroxime axetil* or the co-precipitate, in order to get a more intimate mixture of the zinc salt with the cefuroxime axetil.
>
> In the case of pure amorphous cefuroxime axetil, the process of *manufacture will preferably be to dissolve the zinc salt along with the cefuroxime axetil in suitable solvent and then evaporate the solvent, preferably by spray-drying,* in order to produce amorphous material comprising cefuroxime axetil and a small amount of zinc salt intimately mixed therein. (Emphasis added.)

By stating in this patent application that the zinc chloride is added *in the process of manufacturing* the "pure amorphous cefuroxime axetil" Dr. Sherman has admitted that the zinc chloride is an excipient that has no effect on the "purity" of the cefuroxime axetil, or on the amphorous characteristic of the cefuroxime axetil. The court rejects Dr. Sherman's attempt to characterize the statement as a "mistake" or "typographical error." The document makes numerous distinctions between the manufacture of pure amorphous cefuroxime axetil and the manufacture of a "co-precipitate." Each process includes the addition of zinc chloride. Accordingly, because the Apotex product contains cefuroxime axetil in amorphous form essentially free from crystalline material, and having a purity of at least 95% aside from residual solvents, the court concludes that Apotex's product will infringe claim 1 of the '181 patent.[4]

135. The '883 patent discloses and claims the preparation of highly pure, substantially amorphous cefuroxime axetil by use of a spray drying process. The process starts with highly pure cefuroxime axetil in a solution containing an organic solvent. The solution is sprayed into a heated column through which heated gas is passing. The solvent flash-evaporates, leaving the solid form of the cefuroxime axetil in a collection vessel. By this method, the highly pure cefuroxime axetil is recovered in substantially amorphous form.

3. On July 24, 2000, Dr. Sherman applied for a patent entitled "Stabilized Cefuroxime Axetil." Dr. Sherman wrote the patent application and amendments.

4. Because the Apotex product will literally infringe claim 1 of the '181 patent, it infringes the patent, *Intervet*, 887 F.2d at 1055, and comparison of Apotex's product to the remaining claims is unnecessary. Nonetheless, the court agrees with plaintiff that the Apotex product will infringe the remaining claims of the '181 patent.

136. The term "highly pure solution of cefuroxime axetil" that appears in claim 1 of the '833 patent refers to a starting solution containing highly pure cefuroxime axetil. The term "pure," like the term "purity," means the absence of impurities. The patent states that it is essential that the starting cefuroxime axetil material be at least as pure as the final product. The patent teaches that this highly pure starting material may be spray dried in combination with any number of accepted pharmaceutical excipients in solution.

137. The first element of claim 1 of the '883 patent reads as follows:

> A process for preparing a highly pure, substantially amorphous form of cefuroxime axetil which comprises ...."

Apotex's manufacturing process converts crystalline cefuroxime axetil to amorphous cefuroxime axetil which has less than 2% impurities. This cefuroxime axetil is highly pure and 100% amorphous. Thus Apotex, proposed manufacturing process will infringe this element of the claim.

138. Claim 1 further recites, "preparing a highly pure solution of cefuroxime axetil ..." Apotex starts its manufacturing process using highly pure crystalline cefuroxime axetil which is dissolved in acetone and water, along with the excipients sorbitol and zinc chloride. Apotex spray dries the solution of acetone, water, cefuroxime axetil, sorbitol and zinc chloride. Apotex dissolves highly pure crystalline cefuroxime axetil, in acetone and water, along with sorbitol and zinc chloride, to form a solution. Apotex's process thus meets this second element of claim 1.

139. Claim 1 finally requires:

> spray drying said solution to recover highly pure substantially amorphous cefuroxime axetil.

The acetone and water are volatile solvents and are driven off, resulting in the recovery of highly pure substantially amorphous cefuroxime axetil. The level of impurities present in Apotex's spray dried product (no more than 2%) is virtually unchanged from the level that is present in the starting cefuroxime axetil (1.5%). Accordingly, Apotex's process will literally infringe claim 1 of the '833 patent.

140. Claim 2 of the '833 patent reads as follows:

> 2. The process of claim 1 wherein the solution contains an organic solvent selected from the group consisting of ketones, alcohols, acetonitrile, tetrahydrofuran, dioxan, esters, chlorinated solvents, homogeneous mixtures of at least two of the aforesaid solvents, homogeneous mixtures of at least one of the aforesaid solvents and water."

In its spray drying process, Apotex uses acetone and water, both solvents, to form a homogeneous solution with cefuroxime axetil. Thus, Apotex's process will infringe claim 2 of the '833 patent.

141. Claims 3 and 4 of the '833 patent recite:

> 3. The process of claim 1 wherein the concentration of cefuroxime axetil in the solution prior to recovery is at least 1% m/m.
>
> 4. The process of claim 1 wherein the concentration of cefuroxime axetil in the solution prior to recovery is at least 10% m/m.

Apotex's manufacturing process will infringe claims 3 and 4 of the '833 patent because the concentration of cefuroxime axetil in Apotex's solution is approximately 16.7% on a mass/mass basis.

142. Claim 5 of the '833 patent requires:

> The process of claim 1 wherein the spray drying is effected in the presence of an inert gas."

Apotex's spray drying process is effected in the presence of nitrogen, an inert gas,

as required by claim 5. Accordingly, Apotex's process will infringe claim 5 of the '833 patent.

*Validity*

143. A validity analysis begins with the presumption of validity. An issued patent is presumed valid. 35 U.S.C. § 282.

144. Each claim of the patent is a separate embodiment of the invention. *Bio–Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1562 n. 8 (Fed.Cir. 1996), and the presumption of validity applies separately to each patent claim. *See Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1266–67 (Fed.Cir.1991) ("Each claim carries an independent presumption of validity.").

145. An "accused infringer who raises patent invalidity as a defense bears the burden of showing invalidity by facts supported by clear and convincing evidence." *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 189 F.3d 1370, 1377 (Fed.Cir.1999); *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1334–35 (Fed.Cir.1998).

146. Apotex argues that the claims of the patents in suit are invalid alternatively for anticipation and obviousness. 35 U.S.C. §§ 102, 103.

147. A patent claim is invalid for anticipation where each and every element of the claimed invention is disclosed in a single prior art reference. *In re Paulsen*, 30 F.3d 1475 (Fed.Cir.1994).

148. A patent claim is invalid for obviousness where the differences between the subject matter patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103.

149. An obviousness analysis requires the court's assessment of, (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the prior art and the claimed invention, and (4) objective indicia of obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–19, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

150. Apotex has been unable to identify a single prior art reference that discloses all the limitations of any of the claims of the patents in suit. Without such a reference, Apotex asserts that various elements are "inherently" disclosed by the general "teachings" of the '320 patent.

151. What is "inherently" disclosed in a prior art reference is a question of fact that may arise both in the context of anticipation under 35 U.S.C. § 102 and obviousness under 35 U.S.C. § 103. *In re Grasselli*, 713 F.2d 731, 735 (Fed.Cir.1983). As noted above, anticipation requires the disclosure of each limitation of a patent claim in a single prior art reference. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1575 (Fed.Cir.1991). To the extent an element is not specifically described, inherency requires that the missing element(s) are "necessarily present" and "would be so recognized by persons of ordinary skill" in the relevant art. *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1365 (Fed.Cir.1999).

152. The '320 patent does not expressly disclose either how to prepare highly pure, substantially amorphous cefuroxime axetil or that such a compound might have sufficient bioavailability and stability to be a useful pharmaceutical product.

153. To establish that the '181 patent is anticipated by the '320 patent, Apotex offered the testimony of Dr. Jay Siegel. Dr. Siegel admitted that the '320 patent does not specifically disclose all the limitations of any of the claims of the '181 patent. Thus, Dr. Siegel testified that the various elements of the '181 patent are inherently

disclosed by the general teachings of the '320 patent. To support this conclusion Dr. Siegel performed various experiments purporting to follow the '320 patent in order to clarify its teachings.

154. *Among the cefuroxime esters disclosed* in the '320 patent, Examples 1, 8 and 9 described preparations of cefuroxime axetil. The cefuroxime axetil is in a crystalline form in Examples 8 and 9 (col. 9, line 54—col. 10, line 63), and in an impure amorphous form in Example 1.

155. Because only Example 1 of the '320 patent describes preparation of amorphous cefuroxime axetil, Dr. Siegel testified that his experiments "used the teachings" in Example 1 to prepare and isolate cefuroxime axetil as defined by the claims of the '181 patent. He admits, however, that he did not faithfully follow Example 1, electing instead to follow Example 1 generally, but using certain methods disclosed in the other examples of the '181 patent, which examples admittedly produced crystalline cefuroxime axetil. In particular, Dr. Siegel: (1) bypassed the first reaction step by buying highly pure cefuroxime sodium instead of synthesizing cefuroxime potassium; (2) increased the molar ratio of 1–AEB from a 1:1 ratio to approximately a 1.4:1 ratio; (3) doubled the time for reacting the cefuroxime with the 1–AEB to synthesize the cefuroxime axetil; and (4) reversed the extraction steps. At trial Dr. Siegel offered no persuasive reason for not following example 1 precisely, and the court accepts the testimony of GlaxoSmithKline's expert, Dr. Gribble, that each of Dr. Siegel's alterations was likely to lead to a purer product. The court finds it highly significant that Dr. Siegel had been given and read the '181 patent prior to performing his experiments. Dr. Siegel knew what result he needed to reach. Thus, even if he was acting in the best of faith, that knowledge likely had an effect on his decision, making the credibility of his experiments highly suspect.

The court also rejects Dr. Siegel's supposition that everyone else who had tested Example 1 reached the wrong result. To *support his conclusion that his experiments* were correct, Dr. Siegel testified that the optical rotation value of +84 for crop 2 in the '320 patent is a "typographical error" and should have read +34. This testimony by Dr. Siegel is not credible in light of the undisputed facts that (a) Dr. Gregson's notebook pages recording the original experiment listed the optical rotation as +84, and (b) Dr. Gregory's tests on the original crop 2 samples resulted in the same +84 optical rotation.

The "presumption of validity under 35 U.S.C. § 282 carries with it a presumption that the Examiner did his duty and knew what claims he was allowing." *Intervet,* 887 F.2d at 1054. Thus, Apotex's "burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1467 (Fed.Cir.1990). Dr. Siegel's testimony does not provide the kind of clear and convincing evidence necessary to sustain such a heavy burden. To the contrary, the court finds that his experiments were tainted as described above, and that his conclusions were not credible. Accordingly, the court concludes that Apotex has failed to carry its burden of proving—by clear and convincing evidence or otherwise—that either the '181 or '833 patents is invalid for anticipation by inherency.

Apotex also asserts that the '181 patent claims are invalid for obviousness under 35 U.S.C. § 103, again relying on the '320 patent. However, its own expert, Dr. Siegel, admitted that nothing in the '320 patent teaches or suggests to one skilled in the art that highly pure substantially amorphous cefuroxime axetil would

have the right combination of properties to make a commercially viable product. The '320 patent contains no suggestion that highly pure amorphous cefuroxime axetil has better bioavailability than the crystalline form or that highly pure amorphous cefuroxime axetil would have sufficient stability.

The court concludes that one of ordinary skill in the art would not have reasonably selected the "teachings" of the '320 patent selected by Dr. Siegel, absent Dr. Siegel's knowledge of the '181 patent. In this regard, the court concludes that one of "ordinary skill" in the pharmaceutical art would possess a B.S. degree with 3 to 5 years experience.

Accordingly the court concludes that Apotex has failed to prove by clear and convincing evidence that the '181 or '833 patents are invalid for obviousness.

*Willfulness*

156. "A potential infringer having actual notice of another's patent rights has an affirmative duty of care." *Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Machinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1084 (Fed.Cir.1987). An act of infringement is thus deemed willful when the infringer is aware of another's patent and fails to exercise due care to avoid infringement. *Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056 (Fed.Cir.1994); *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1109 (Fed. Cir.1986). This standard of care typically requires an opinion from competent patent counsel prior to engaging in any potentially infringing activities. *Underwater Devices, Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380, 1389–90 (Fed.Cir.1983). To establish willfulness, GlaxoSmithKline must demonstrate by clear and convincing evidence, considering the "totality of the circumstances," that Apotex willfully infringed its patent. *Electro Medical,* 34 F.3d at 1056.

157. Having carefully reviewed the record herein, the court concludes that Apotex's ANDA filing is permeated by a lack of due care. Dr. Sherman, Apotex's CEO and the architect of Apotex's non-infringement argument, testified that he has never obtained an opinion of independent patent counsel on either non-infringement or invalidity in this case.[5] Although he is not a qualified attorney, Dr. Sherman testified that he felt no need to obtain an independent opinion because of his own review of the patents in suit. Without an opinion from independent patent counsel, and without having reviewed the file histories of the patents in suit, Dr. Sherman decided to file Apotex's ANDA. At trial, when confronted with these facts, Dr. Sherman could refer only to the hearsay declaration of a hired expert witness that was filed in Canada[6] as justification for proceeding with his infringing generic product. The court finds that, under any standard, this does not qualify as "due care". *Electro Medical,* 34 F.3d at 1056; *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1580 (Fed.Cir.1986).

5. The court finds it relevant that Dr. Sherman has failed to obtain an opinion of counsel in other infringement suits and has been charged previously with willful infringement shortly before he caused Apotex to file the ANDA which precipitated this suit. *See SmithKline Beecham Corp. v. Apotex Corp.*, 1999 WL 311697 at *2 (N.D.Ill. May 13, 1999).

6. As noted by the Federal Circuit in its order affirming this court's granting of the preliminary injunction herein (at p. 7, n. 1), "the Canadian judgment construing the Canadian patent and applying Canadian patent law does not control" the decision in the instant case.

158. Instead of an independent opinion from patent counsel, Apotex offers a non-precedential administrative proceeding in Canada as evidence of its good faith litigation in this case. This is unacceptable. Apotex knew in May 1999 that an opinion from independent counsel was a preferred prerequisite to any attempt to refute a charge of willfulness by the district court's decision in *SmithKline Beecham Corp. v. Apotex Corp.*, 1999 WL 311697 (N.D.Ill. 1999). The fact that Apotex had not obtained such an opinion at the time of filing its ANDA in April 2000, approximately one year after that decision was issued by a judge of this court, confirms that Apotex deliberately failed to take due care to respect GlaxoSmithKline's patent rights.

159. Dr. Sherman, who can well afford patent counsel, testified that he had been eyeing Ceftin® as a targeted product for years with expectations of achieving hundreds of millions of dollars in sales. Thus, although he was well aware of GlaxoSmithKline's patents in suit and understood from other U.S. lawsuits the nature of a willfulness charge and the requirement to obtain an opinion of patent counsel, he caused Apotex to file its ANDA without any legal analysis of these patent rights.

160. Dr. Sherman's attempt to rely on the imminent issuance of an Apotex patent directed, as he put it, to Apotex's co-precipitate, as evidence of non-infringement and lack of willfulness, is unpersuasive. First, the Apotex patent is directed to the use of zinc chloride as a stabilizer of the amorphous cefuroxime axetil in the Apotex co-precipitate, as stated in the Examiner's Reasons for Allowance. Second, its issuance is irrelevant to the question of infringement of GlaxoSmithKline patents. *See Eli Lilly & Co. v. Barr Labs. Inc.*, 222 F.3d 973, 987 (Fed.Cir.2000). Finally, in the specification of this patent, which was written by Dr. Sherman, he specifically describes the co-precipitate as containing amorphous cefuroxime axetil. Faced with this admission of infringement in the application he drafted, Dr. Sherman labeled his statement a "typographical error".

161. This attempt to evade as "errors" or "mistakes" other significant admissions Apotex made, for example in its dealings with the USP, was also the centerpiece of the testimony of another Apotex witness. Dr. Cappuccino, the person ultimately responsible for these admissions, disavowed any responsibility for the statements during direct examination and characterized them as unauthorized. However, the court finds Dr. Cappuccino's testimony was not credible, and that as shown on cross-examination, Dr. Cappuccino had himself instructed that these statements be written.

162. Apotex's expert, Dr. Siegel, also found the "typographical error" to be a convenient explanation. During his testimony, Dr. Siegel attempted to justify his experimental results by insisting that the '320 patent contains a "typographical error". Dr. Siegel persisted in this charade although the '320 patent disclosure was confirmed by Dr. Gregson's laboratory notebook recording the original data, and by the later-filed declaration of Dr. Gregory during prosecution of the '181 patent.

163. Dr. Sherman's cavalier ANDA filing and the non-credible trial testimony of Apotex's witnesses are classic examples of conduct that clearly and convincingly demonstrates willfulness. *See Comark Comm., Inc. v. Harris Corp.*, 156 F.3d 1182, 1190 (Fed.Cir.1998); *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir. 1986).

164. Apotex's attempt to avoid a finding of willfulness on the ground that it did not provide a written certification when its ANDA was filed does not avoid the clear evidence of willfulness, particularly in view of the various admissions of infringement contained in its submissions to the FDA,

which Apotex attempted to contradict or minimize at trial. Accordingly, the court finds that the filing of the ANDA by Apotex triggered GlaxoSmithKline's infringement claim and constituted willful infringement in view of the circumstances described above.

165. A holding of willful infringement is sufficient to make a case exceptional and entitles the opposing party to its attorney fees. 35 U.S.C. § 285; *Avia Group Int'l. Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1567 (Fed.Cir.1988). Such an award is appropriate here. The court finds that as a result of Apotex's ANDA filing, without a reasonable basis for believing that it had a right to market its generic product prior to patent expiration, GlaxoSmithKline has been compelled to prosecute an infringement claim at great expense. Because Apotex's infringement is prospective in nature, patent damages are unavailable. Under these circumstances, an award of attorney fees would properly resolve the action.

## *CONCLUSION*

For the reasons set forth above the court concludes that Apotex's proposed generic product will infringe the '181 and '833 patents and enters a permanent injunction enjoining Apotex from manufacturing its product for the life of those patents. The court also concludes that GlaxoSmithKline has met its burden of proving willful infringement by clear and convincing evidence. GlaxoSmithKline is therefore entitled to its costs and attorneys' fees incurred in prosecuting this suit and is directed to submit an application to the court pursuant to L.R. 54.3 within 28 days of this order.